**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **FREDRICK PRINTESS NICHOLS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11-2957-STA-tmp** |
| | ) | |
| **DREXEL CHEMICAL COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Drexel Chemical Company's Motion for Summary Judgment (D.E. # 45) filed on February 28, 2013, and Amended Motion for Summary Judgment (D.E. # 49) filed on March 15, 2013. Plaintiff, who is proceeding *pro se*, has filed a response in opposition, and Defendant has filed a reply brief. For the reasons set forth below, Defendant's Motion is **GRANTED**.

## BACKGROUND

Plaintiff alleges that Defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA"); discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA") and THRA; failed to pay him overtime as required by the Fair Labor Standards Act ("FLSA"); terminated his employment in retaliation for Plaintiff's complaints about the discrimination; negligently hired and trained members of company management; and intentional

1

infliction of emotional distress ("IIED").

## I. Factual Background

The following material facts are not in dispute for purposes of summary judgment unless otherwise noted. Defendant Drexel Chemical Company operates a chemical plant located in Tunica, Mississippi. (Def.'s Statement of Undisputed Fact ¶ 1.) Defendant hired Plaintiff Fredrick Printess Nichols to work as a chemist at the Tunica plant. (*Id.* ¶ 2.) Bob Shockey, the owner of Drexel Chemical Company, and Ben Johnson, the president of the company, ultimately made the decision to hire Plaintiff at the recommendation of Bruce Tonkel, the company's then-head of quality control. (*Id.*) Plaintiff was hired as a chemist with responsibilities for analysis, training, and management. (*Id.* ¶ 3.)

## A. Plaintiff's Promotion to QC Lab Manager

On April 25, 2011, Defendant promoted Plaintiff to the position of quality control ("QC") lab manager. (*Id.* ¶ 9.) Based on Tonkel's recommendation, Shockey, Johnson, and Stanley Bernard ("Bernard") made the decision to promote Plaintiff. (*Id.*) Plaintiff received an annual salary of $45,000, a raise from his previous salary of $36,000.00 per year. (*Id.*) In his new position, Plaintiff had supervisory and disciplinary authority over the lab personnel: Robin Campbell, a lab technician, and Shirelle Arnette, a chemist. (*Id.* ¶ 10.) Plaintiff also had responsibility for hiring and training lab personnel. (*Id.*) Tonkel resigned approximately thirty days after Plaintiff's promotion. (*Id.*) Thereafter Plaintiff ran the lab area. (*Id.*) As QC lab manager, Plaintiff's responsibilities included the following: the timely submission of analytical data from the lab and correctly written batch sheets with proper weight ranges for different substances; maintaining the general condition of the lab and its equipment, including keeping the lab clean and immediately reporting any

problems with the lab equipment to the head of QC; and ensuring that lab staff followed standard operating procedures. (*Id.* ¶ 14.)[1]

Around the last week of May 2011 and shortly after Tonkel's resignation, Jim Reagor ("Reagor"), Defendant's director of purchasing and scheduling, began monitoring the QC function at the Tunica plant. (*Id.* ¶ 11.)[2] Reagor had previously monitored QC for ten years before advancing to a higher position in the company. (*Id.*) During his first visit to the Tunica plant in May 2011, Reagor met with Steve Borden ("Borden"), the manager of the plant, to discuss QC problems in Tunica. (*Id.* ¶ 15.) For example, lab personnel were not turning in timely analytical data, were incorrectly writing batch sheets, and were repeatedly marking improper weight ranges for the formulated products. (*Id.*) Specifically, lab personnel were marking improper weight ranges on the products because they were not differentiating between the weight range for a "true liquid" and the weight range for a "flowable product." (*Id.*) As a result, Borden himself had to re-weigh products and correct the markings prior to distribution. (*Id.*)[3]

_____

[1] Plaintiff adds that the lab was understaffed. (Pl.'s Resp. to Def.'s Statement of Fact ¶ 14.) According to Plaintiff, the lab had one manager and four chemists prior to his tenure. (*Id.*) During Plaintiff's tenure, the lab had only two chemists (including Plaintiff) for three months and three chemists (including Plaintiff) for three more months. (*Id.*) Plaintiff also asserts that he notified management of defective equipment in the lab. However, Plaintiff has cited no evidence in support of his contentions. More importantly, the Court finds that Plaintiff's assertions are not material to the legal issues presented. Therefore, the Court declines to consider Plaintiff's unsupported statements.

[2] Plaintiff states that he has no information about Reagor's monitoring of the QC at the Tunica plant. Plaintiff has not shown that a genuine dispute exists as to this fact. Therefore, the Court will deem it admitted for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

[3] Plaintiff adds that he was never made aware of these concerns and actually received good evaluations from Tonkel. Again Plaintiff has cited no evidence in support of his contention. Therefore, the Court will deem Defendant's statement admitted for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

Reagor also found that the QC lab in Tunica was dirty and disorganized. (*Id.* ¶ 16.) Two of the machines, the particle size analyzer and the titrimeter, were not functioning. (*Id.*) Reagor had previously seen a memorandum from Tonkel advising that there was a minor problem with the particle size analyzer in the Tunica lab. (*Id.*) According to Reagor, Plaintiff had not notified him that the analyzer was not working at all or that there were problems with the titrimeter. (*Id.*)[4] Reagor instructed lab personnel that they were to report to him until further notice. (*Id.* ¶ 17.) Reagor further instructed Plaintiff to call him twice daily so that Reagor could determine whether the lab was adjusting batches in a timely fashion to support efficient production. (*Id.*) Plaintiff testified that he did not know if he was told to report twice a day to Reagor. (*Id.*)[5]

**B. Problems With Sodium Chlorate Titration**

During Plaintiff's employment, Defendant held three training sessions for Tunica lab personnel on sodium chlorate titration. (*Id.* ¶ 18.) David Parker ("Parker"), the assistant manager of the Tunica plant, conducted two sessions, on November 3, 2010, and June 3, 2011, respectively. (*Id.*) Plaintiff attended both sessions. (*Id.*) On June 1, 2011, Wesley Jones ("Jones"), a QC lab

---

[4] Plaintiff responds that he addressed a memo to Tonkel recommending that Defendant hire an outside vendor to maintain the instruments. Plaintiff has not cited any evidence about the memorandum and has attached to his brief only a document that appears to be a manufacturer's recommendation about maintenance for an unidentified device known as a HPLC system. Pl.'s Resp., ex. 3. The document is not authenticated and on its face does not indicate how it is relevant to Plaintiff's discrimination claims. As more fully discussed below, the Court declines to consider this exhibit.

[5] In response to these facts, Plaintiff has asserted additional facts related to the processing of Diuron on sandmills. (Pl.'s Resp. to Def.'s Statement of Fact ¶ 17.) It is not clear how Plaintiff's additional facts create a genuine dispute about Reagor's observations at the Tunica lab. More importantly, Plaintiff has not cited any evidence to support his contentions. Therefore, the Court will deem Defendant's statement admitted for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2).

manager from Defendant's Memphis plant, conducted a three-day session on sodium chlorate tritration. (*Id.*) Jones trained lab personnel on the proper mixture of ferrous sulfate before adding it to sodium chlorate. (*Id.*) In Jones' opinion, Plaintiff was not attentive during the three-day training session. (*Id.* ¶ 19.) Jones observed Plaintiff doing unrelated paperwork on his computer and working on a sample of a different product while Jones was conducting the training. (*Id.*) Jones also noted that on more than one occasion, Plaintiff simply walked away while Jones was explaining procedures. (*Id.*) Plaintiff admits that he was possibly present for the training but that he does not recall whether he visibly ignored Jones. (*Id.*)

Within a week of the training sessions with Jones, the lab was having problems running titration for sodium chlorate, causing a four percent bias in the analytical data. (*Id.* ¶ 20.)[6] Plaintiff testified that he does not remember the four percent bias problem. (*Id.*) Jones returned to the Tunica plant in order to investigate the titration problem and found that the cause of the bias in the analytical data was an improper mixture of the ferrous sulfate solution. (*Id.* ¶ 21.) Plaintiff testified that he did not remember the problem with the ferrous sulfate solution but admitted that it was his responsibility to ensure that the ferrous sulfate solution was made correctly. (*Id.*)[7]

## C. Problems With the HPLC Instrument

Diuron, a herbicide, is one of the chemicals that Defendant produces at its Tunica plant. (*Id.*

---

[6] Although Defendant has not provided a technical explanation of this result, it is not clear to the Court that a technical explanation is required to reach the merits of Plaintiff's discrimination claims.

[7] In response to these statements, Plaintiff has stated he does not remember these incidents. Plaintiff has not denied that they happened or cited evidence to show that they did not occur. The Court finds then that Plaintiff has not created a genuine dispute as to these facts for purposes of summary judgment and deems the facts admitted. Fed. R. Civ. P. 56(e)(2).

¶ 22.)  Diuron 4L is a variation of Diuron also produced by Defendant.[8]  According to Defendant, one batch of Diuron is worth approximately $100,000.00.  (*Id.*)  An "assay" determines the content of a specific component in a solution and is used to determine the content of Diuron.  (*Id.* ¶ 28.) Drexel uses a high-pressure liquid chromatography ("HPLC") instrument to assay the Diuron mixtures and determine whether any adjustments need to be made.  (*Id.* ¶ 23.)  It is very important for the lab to properly assay Diuron to ensure that the mixture is within the appropriate range.  (*Id.*) Not only is it illegal to distribute improperly formulated Diuron,[9] Defendant also can face civil liability if customers use improperly formulated Diuron and sustain damages to their crops.  (*Id.*) Since testing Diuron is one of the most important steps in its production, it is critical that the machines used in the lab to test the batches are functioning properly and producing accurate test results. (*Id.* ¶ 24.)  Before the lab uses the HPLC to analyze a batch of Diuron, the lab must ensure that the equipment is functioning properly by testing the linearity of the output.  (*Id.*)  The most precise linearity is one-hundred percent (100%), but results at or above ninety-eight percent (98%) are acceptable.  (*Id.*)  Linearity results below ninety-eight percent (98%) are unacceptable, and the lab must correct the precision of the HPLC instrument before using the machine. (*Id*.)

Around the first week of June 2011, Reagor sent Natasha Howard ("Howard"), a technician from Memphis, to the Tunica lab to check the linearity on the HPLC and gas chromatography ("GC") machines and conduct a training session on the GC with lab personnel in Tunica. (*Id.* ¶ 25.) Howard's testing revealed that the linearity of the HPLC was off by three percent (3%), meaning the

---

[8] Defendant refers to "Diuron" and "Diuron 4L" interchangeably.

[9] Defendant claims that under the Federal Insecticide Fungicide and Rodenticide Act, 7 U.S.C. § 136(j)(a)(1)(E) (2012), it is unlawful to sell an adulterated or misbranded pesticide. Defendant has cited for support Miss. Code. Ann. § 69-23-5 (1)(e).

instrument was only ninety-seven percent (97%) precise. (*Id.* ¶ 26.) This measurement was unacceptable because it meant the HPLC was producing inaccurate analytical results and the lab would have been using those results to make adjustments to the batches. (*Id.*) Inaccuracy in the analysis reduces the value of the batch. (*Id.*) For example, a batch of Diuron that is off three percent (3%) reduces the value of the batch by approximately three thousand dollars ($3,000.00). (*Id.*) Plaintiff was responsible for ensuring that the linearity of the HPLC was at or above ninety-eight percent (98%) before using the machine to test Diuron. (*Id.* ¶ 27.)[10]

Due to his concern about the margin of error on the HPLC instrument, Reagor asked Howard to assay three random samples of Diuron. (*Id.* ¶ 28.) Reagor then compared Howard's results to the Diuron jug samples in Memphis and found inaccuracies in the liquid chromatography numbers. (*Id.*) Reagor re-tested the jug samples and found that the results were substantially different than the results the Tunica lab had been reporting for the sampled batches. (*Id.*) Reagor suspected that the Tunica lab was violating standard operating procedures by averaging batch results and making adjustments according to the averages, rather than testing each batch separately. (*Id.*)[11]

Plaintiff denies averaging the numbers and instead blames the problems on defective

_____

[10] According to Reagor, Plaintiff had not informed him of any problems with the lab equipment, and the only issue that Mr. Tonkel had reported was the minor problem with the particle size analyzer. Def.'s Mot. for Summ. J., ex. 22, Aff. Reagor. Plaintiff testified that Tonkel told Plaintiff to write a memo about the instrumentation problems, but Plaintiff cannot recall "where the memo went." Def.'s Mot. for Summ. J., ex. 2, Dep. Nichols 229:21-230:20, March 23, 2012. Plaintiff later stated that he is "pretty sure" he sent Tonkel a memo asking for a new HPLC. *Id.* at 138:3-7.

[11] Defendant has asserted other facts related to Howard's work at the Tunica lab. Def.'s Statement of Undisputed Fact ¶¶ 30-32. The Court finds that none of these facts are material to the issues of law presented in Defendant's Motion for Summary Judgment. Therefore, the Court declines to address them here.

equipment.  (*Id.* ¶ 29.)  Plaintiff has not actually cited any evidence in support of his version of events surrounding the problems with the HLPC instrument.  Nevertheless, Plaintiff asserts the following about the HLPC.  Plaintiff claims that he raised concerns about the HPLC instrument as early as January 2011, though he was never actually aware of the linearity issue because no one informed him of it.  (Pl.'s Resp. to Def.'s Statement of Fact ¶¶ 23, 24, 27.)  Plaintiff noted that the instrument had not been serviced since 1995.  (*Id.*)  Defendant refused to have the instrument serviced and instead allowed Plaintiff to use the HLPC instrument from its Memphis lab.  (*Id.* ¶ 23.)  Plaintiff claims that regular maintenance would have corrected the linearity issue with the instrument.  (*Id.* ¶¶ 24, 25.)  Plaintiff further claims that lab personnel in Tunica did not use the HLPC instrument in the Tunica lab from January 2011 to May 2011 because Plaintiff did not trust the instrument.  (*Id.* ¶ 26.)  Plaintiff used the instrument from Memphis until it was removed in May 2011.  (*Id.* ¶ 25.)  When management did not respond to Plaintiff's requests for service on the instrument, Plaintiff stopped making his complaints.  (*Id.* ¶ 29.)

Due to the problems at the Tunica lab, Reagor directed Plaintiff to start making the batch sheets himself and to send copies to Memphis for Reagor and Borden to approve.  (*Id.* ¶ 33.)  Reagor taught Plaintiff how to calculate batch sheets manually.  (*Id.*)  Even then Reagor found numerous mistakes in Plaintiff's calculations.  (*Id.* ¶ 34.)  For example, Reagor discovered errors on a batch of Diuron 4L where Plaintiff had incorrectly calculated the addition of eleven (11) bags of Terasperse.  (*Id.*)  After reviewing Plaintiff's calculation, Reagor and Borden held a conference call with Plaintiff and explained the correct calculation method to him.  (*Id.*)[12]

---

[12] Plaintiff responds that he was unaware of any problems with his batch sheets or calculation errors.  Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶¶ 33, 34.  However, Plaintiff has cited no evidence in support of his claim.  Moreover, it is not clear to the Court

**D. The Diuron Incident**

On June 11, 2011, Stanley Bernard and Reagor visited the Tunica lab and noticed pressure problems with the HPLC instrumentation, which were affecting Diuron production. (*Id.* ¶ 35.) In order to run a sample of Diuron, the lab needed to eliminate the problem. (*Id.*) So Reagor asked Hattin Grilliette ("Grilliette"), a chemist and Defendant's manager of surfactants and emulsifiers, to go to Tunica to troubleshoot the machine. (*Id.*)[13] Grilliette went to the Tunica lab on June 21, 2011, to work on the HPLC. (*Id.* ¶ 36.) Grilliette brought an HPLC instrument from Memphis which he knew was working properly and used that instrument to troubleshoot the Tunica HPLC instrument. (*Id.*) After adjusting the HPLC instrument in the Tunica lab, Grilliette ran some Diuron 4L samples on it in order to determine whether the pressure problem was resolved. (*Id.*)

On June 22, 2011, Plaintiff called Grilliette to ask about the results from the samples. (*Id.* ¶ 37.).[14] Grilliette told Plaintiff that he had not saved the results but that he thought they were in the range of 44-45%. (*Id.*) According to Grilliette, he advised Plaintiff to re-assay the tanks before making any adjustments. (*Id.* n.14.) While Plaintiff denies that Grilliette told him to re-assay the

---

whether Plaintiff is even disputing Defendant's assertions. Therefore, the Court deems these facts admitted. Fed. R. Civ. P. 56(e)(2).

[13] Plaintiff adds that there were problems with the HPLC instrument and that he was not involved in fixing the problem. As with most of Plaintiff's assertions, he has cited no evidence in support of his claim. Even if true, Plaintiff's additional facts do not show that a genuine dispute exists on this point. Therefore, the Court deems these facts admitted. Fed. R. Civ. P. 56(e)(2).

[14] Plaintiff responds that he "is unaware of these statements." Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶¶ 37. However, Plaintiff has cited no evidence to dispute Defendant's claim. It is not clear to the Court whether Plaintiff is even disputing Defendant's assertions on this point. Therefore, the Court deems these facts admitted. Fed. R. Civ. P. 56(e)(2).

tanks, Plaintiff admits that he did not recheck the numbers or re-assay the tanks. (*Id.*)[15] Defendant's standard lab protocol requires lab personnel to assay the tanks themselves before making adjustments. (*Id.* ¶ 38.) It is a serious violation of standard operating procedure to make adjustments to a product batch based on another individual's test results. (*Id.*) Averaging a series of test results instead of personally performing an assay on each batch violates standard operating procedure. (*Id.*) Plaintiff did not personally assay the tanks. (*Id.* ¶ 39.) Instead, Plaintiff made two large water adds to a batch of Diuron 4L that Grilliette had not even tested. (*Id.*) Plaintiff admitted in his deposition that he did not perform his own analysis on the batch. (*Id.*) Plaintiff also admitted that he added water to the batch after he spoke to Grilliette. (*Id.*) Because Plaintiff added water without assaying the tanks, both batches of Diuron came out five percent (5%) low. (*Id.* ¶ 40.)

Plaintiff responds that he did add ten inches of water to two different batches of Diuron, batch numbers 105 and 106. (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 38.) According to Plaintiff, Defendant's standard operating procedure called for fourteen to sixteen inches of water to be added to a batch. (*Id.*) The specifications for Diuron called for the levels to be between 39.8 percent and 40.2 percent. (*Id.*) After Plaintiff added water to batch numbers 105 and 106, the Diuron level for batch 105 was 38.95 percent and for batch 106 was 38.68 percent, an average of 38.79 percent. (*Id.*) Plaintiff contends that Defendant could have blended these batches with other batches having a higher Diuron concentration. (*Id.*) In fact, Plaintiff claims that this is what Defendant did after Plaintiff was fired over the incident. (*Id.*) Plaintiff further maintains that it was

_____

[15] Plaintiff admitted in his deposition that, if a chemist tells you to re-assay, then one should definitely recheck the numbers. *Id.* ¶ 37. Plaintiff adds that Grilliette stated in his affidavit that he assayed batch number 106 but did not keep the results, a violation of standard operating procedure. Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 37. Plaintiff has not shown why this additional fact is material to the issues presented.

proper for him to add water to the batches based on assays performed by other chemists.  (*Id.*)[16]

Bernard and Reagor traveled to Tunica from Memphis to assess and control the damage from the error.  (*Id.* ¶ 40.)  Reagor made the decision to fire whoever was responsible for diluting the batch before he learned who had added the water.  (*Id.* ¶ 41.)  Campbell heard members of management say that the person who was responsible for the incident would be terminated.  (*Id.*)  Reagor reviewed the handwritten batch-add sheets and found that Plaintiff had added two large water quantities of water to the batch and had signed his initials at the bottom of the sheets.  (*Id.* ¶ 42.)  Based on these notes, Reagor concluded that Plaintiff was responsible for the incident.  (*Id.*)  Defendant was able to salvage the diluted batches of Diuron.  Before reprocessing the product, Defendant had to move the damaged batches to storage, resulting in production delays at the Tunica plant. (*Id.* ¶ 44.)  Other employees at the plant had to work overtime and nights to reprocess the batches. (*Id.*)  As a result of the production delay and the overtime paid to other workers to correct the problem, the incident cost Defendant between $10,000 and 15,000.  (*Id.*)[17]

Reagor terminated Plaintiff's employment on June 23, 2011. (*Id.* ¶ 45.)  Bob and Leigh Shockey, the owners of the company, and Bernard approved the termination decision.  (*Id.*)  Reagor drafted a separation notice for Plaintiff, stating that Defendant had discharged Plaintiff effective June 23, 2011, for "[n]ot following standard operating procedures and disregarding direct verbal

---

[16] By and large, Plaintiff has again cited no record evidence in support of his factual claims.  The Court has considered Plaintiff's deposition testimony about the Diuron incident and finds that the testimony does support his response to Defendant's statement ¶ 38.  Still, the testimony does not create a triable issue as to any of Plaintiff's claims.

[17] Plaintiff denies these damages but without citing any evidence to support his denial. Plaintiff only states that he followed standard operating procedures by adding the water and if anything added less water than procedure called for.  Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶¶ 43-44.

instructions to check in twice daily." (*Id.* ¶ 46.)  Reagor has affirmed that he made the decision to terminate Plaintiff's employment without regard to Plaintiff's race, age, or any other impermissible factor.  (*Id.*)[18]  According to Defendant, Plaintiff had a number of other problems managing the lab, such as keeping accurate records.  (*Id.* ¶ 47.)[19]  Plaintiff disputes this assertion and argues that Defendant only documented problems with Plaintiff's performance after his termination.  (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 47.)

Plaintiff admitted at his deposition that he has no proof of being replaced as lab manager by a white employee.  (Def.'s Statement of Undisputed Fact ¶ 49.)  In fact, Plaintiff admitted that Defendant did not hire anyone to replace him.  (*Id.*)[20]  Plaintiff further admitted that he has no evidence that his termination was a result of intentional racial discrimination (*Id.* ¶ 50) or that he was subjected to a pattern of discrimination and misconduct in the workplace based on age or race.  (*Id.*

---

[18] Plaintiff adds that Reagor did not inform him of the reasons for his termination on June 23.  Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 46.  Plaintiff has cited no evidence for his denial.  Plaintiff admits that he did receive the separation notice dated June 29 and attached the notice to his summary judgment brief.  Therefore, the Court deems these facts admitted.  Fed. R. Civ. P. 56(e)(2).

[19] Defendant has cited additional evidence that Plaintiff attempted to block calls from Reagor on his cell phone.  Def.'s Statement of Undisputed Fact ¶ 47.  Plaintiff admitted in his deposition that he may have asked other employees about how to block calls on his cell phone but responds here that he did not have a company-issued cell phone.  Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 47.  Neither party has shown why this fact is material or relevant to the legal issues presented.  Therefore, the Court declines to address it.

[20] Defendant asserts additional information about Plaintiff telephoning another lab employee in January 2012 to inquire whether Defendant had hired anyone to replace him in the lab.  Def.'s Statement of Undisputed Fact ¶ 49.  Defendant has not shown why this fact, even if undisputed, is material to the issues at summary judgment.  In his response Plaintiff refers to his claim for Mississippi unemployment compensation.  However, Plaintiff has not shown how this evidence is relevant or admissible.  Therefore, the Court declines to consider these asserted facts.

¶ 51.)[21] Plaintiff responds that Defendant had no cause to terminate his employment over the Diruon incident because Plaintiff followed the correct procedures. (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 49.) Plaintiff states his belief that his unpaid overtime played some part in his termination based on the fact that Defendant paid him his overtime one week after his termination. (*Id.* ¶ 50.)[22] Defendant asserts that Plaintiff has no evidence to support his negligence claim or his claim that Defendant failed to make or keep records other than his overtime records. (Def.'s Statement of Undisputed Fact ¶¶ 52-54.) Plaintiff responds that his negligence claim is based on his wrongful termination and that the batch sheets constitute evidence to support his claim. (Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶¶ 51, 52.)[23]

**E. Retaliation**

During the entirety of his employment with Defendant, Plaintiff never complained to his supervisors about any form of age or race discrimination. (Def.'s Statement of Undisputed Fact ¶

---

[21] Plaintiff also states that Defendant was negligent in terminating him, which supports his claim for punitive damages. Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 51.

[22] Plaintiff also asserts that Robin Campbell testified about a conversation she had with Parker, who was the plant manager. According to Plaintiff, Parker told Campbell "he had to get rid of some of these niggers around here." Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 49. Plaintiff has not cited Campbell's testimony or any other evidence to support this characterization of Campbell's testimony. None of the excerpts of Campbell's deposition transcript, which are in the record (D.E. # 45-5, 54-14), support Plaintiff's assertion. Furthermore, there is no evidence connecting Parker in any way to Plaintiff's termination or any other discriminatory conduct. Therefore, the Court declines to consider Plaintiff's contention.

[23] The parties have also cited evidence that Plaintiff received treatment for stress during his tenure with Defendant. Def.'s Statement of Undisputed Fact ¶ 55. Presumably this evidence would go to Plaintiff's IIED claim. Because the Court dismisses that claim on other grounds, the Court need not consider Plaintiff's medical treatment for stress.

12.)[24]  Plaintiff claims that David Parker, the assistant manager of the Tunica plant, and Steve Borden, the manager of the plant, both of whom are white, received more favorable treatment than he did.  (*Id.*)  According to Plaintiff, Borden and Parker only worked five days a week, while Plaintiff worked six days a week. (*Id.*)  Plaintiff was not sure when Borden and Parker had their days off or whether this occurred during the time that Plaintiff was lab manager.  (*Id.*)

Under Defendant's company policy, if an employee complains of unlawful discrimination, the complaint goes to Dan Kim ("Kim"), Defendant's accounting manager and head of the payroll and personnel departments.  (*Id.* ¶ 13.)  Kim has no record of Plaintiff of ever lodging a complaint about unlawful discrimination during Plaintiff's tenure.  (*Id.*)

### F. Overtime Compensation

Plaintiff was a salaried employee and had responsibility for tracking his own hours worked during his tenure with Defendant.  (*Id.* ¶ 4.)[25]  Plaintiff admits that he kept track of his hours worked in a notebook but that he no longer has the notebook in his possession.  (*Id.*)  On March 5, 2011, Plaintiff emailed Tonkel and stated that he was owed $1,888.46 in overtime.  (Id. ¶ 5.)  Plaintiff

---

[24] Plaintiff adds that he complained to Tonkel on several occasions about his overtime pay, long hours, and not receiving a day off.  Pl.'s Resp. to Def.'s Statement of Fact ¶ 12. Plaintiff cites an unauthenticated document addressed to "Bruce" and inquiring about overtime, a promotion to lab manager, and a raise.  Pl.s' Resp. in Opp'n, ex. 2.  As more fully discussed below, the Court declines to consider this unauthenticated exhibit.  Even if the Court considered the document, nothing in the paper refers to discrimination on the basis of some protected characteristic.  Therefore, Plaintiff has not shown how the document creates a genuine dispute about his engaging in some form of opposition to age or race discrimination.

[25] Plaintiff adds that he worked overtime from January 2011 through March 2011 and that Tonkel promised overtime pay for those hours.  This contention does not actually dispute Defendant's statement that Plaintiff was salaried and tracked his own time at work.  Moreover, the evidence Plaintiff has attached to his brief appears to consist of memos and emails, referring to his overtime hours during this period of time.  The exhibits are not authenticated in anyway. Therefore, the Court declines to consider them at summary judgment.

14

admits that he received from Defendant three payments for his overtime in the amounts of $500.00, $1000.00, and $895.58. (*Id.* ¶ 6.) Plaintiff adds that his overtime was paid in July 2011, one week after his termination, and that all other payments were labeled as bonuses. (Pl.'s Resp. to Def.'s Statement of Fact ¶ 6.)

Following the termination of his employment on or about June 30, 2011, Plaintiff claimed that Defendant had not compensated him for overtime hours worked from mid-January to April 2011. (Def.'s Statement of Undisputed Fact ¶ 7.) Defendant could not verify Plaintiff's claim but issued two checks to Plaintiff on June 30, 2011, in the gross amount of $2,394.16. (*Id.*) On July 1, 2011, Plaintiff again contacted Defendant, claiming that he was due overtime compensation for work performed before January 17, 2011. (*Id.* ¶ 8.) Defendant again was unable to verify Plaintiff's claim but issued a third check to Plaintiff the same day for the full amount that he demanded, $1,116.35. (*Id.*) Plaintiff admitted to Robin Campbell, a lab technician employed by Defendant, that he had received compensation for his overtime hours. (*Id.* ¶ 6.) Plaintiff has no other facts, evidence, or witnesses to support his claim that he was denied overtime compensation. (*Id.*)

## II. The Parties' Arguments

Defendant seeks judgment as a matter of law on all of Plaintiff's claims. Defendant argues that Plaintiff cannot establish the elements of his race discrimination claim. Plaintiff cannot show that he was replaced by a non-protected employee after his termination or that he was treated differently than a non-protected employee. The only comparator employees cited by Plaintiff are his supervisor Reagor and the plant manager and assistant plant manager. According to Defendant, none of these employees were similarly situated to Plaintiff because all of them held substantially different positions or responsibilities. Furthermore, Plaintiff has only proven that plant management received

days off that he did not receive. Defendant contends that time off is not a materially adverse employment action. Even if Plaintiff could prove this claim, Defendant argues that it had a legitimate reason for terminating Plaintiff and that Plaintiff has no proof of pretext. On the pretext issue, Defendant argues that it had an honest belief Plaintiff was responsible for the Diuron incident. Defendant adds that the evidence supports an inference that discrimination played no role in Plaintiff's termination because the same individuals who hired Plaintiff also made the decision to fire him. For these reasons, Defendant argues that Plaintiff cannot prove his race discrimination claim.

Likewise, Defendant argues that Plaintiff cannot show that he engaged in any protected activity to support his Title VII retaliation claim and cannot make out a claim for age discrimination. Plaintiff admitted in his deposition that he had no evidence of being replaced by a younger employee or any other evidence of age discrimination. Defendant next argues that Plaintiff has not shown any violation of the FLSA. Defendant paid Plaintiff all of the overtime compensation to which he was entitled while he was still a chemist. Defendant argues that once Plaintiff was promoted to lab manager, he was no longer entitled to overtime under the FLSA's administrative exemption or executive exemption. Additionally, Plaintiff self-reported his overtime and admits that he has no records of any overtime he worked after April 2011. Defendant argues that Plaintiff cannot prove his claims under state law for negligent hiring and supervision or intentional infliction of emotional distress. According to Defendant, Plaintiff admitted in his deposition that he has no proof to support his claim for negligent hiring and supervision. Plaintiff also has no proof of any outrageous conduct on Defendant's to support his IIED claim. Finally, Defendant argues that Plaintiff has no evidence to support his claim for punitive damages. Plaintiff admitted that he cannot prove Defendant acted

intentionally, fraudulently, maliciously, or recklessly. Therefore, summary judgment on all of Plaintiff's claims is proper.

Plaintiff has filed a *pro se* response in opposition to Defendant's Motion for Summary Judgment. Rather than addressing Defendant's legal arguments, Plaintiff has responded only to Defendant's statement of the facts at summary judgment. The Court will consider the merits of Plaintiff's claims below.

Defendant's reply largely consists of evidentiary objections to Plaintiff's brief. Defendant argues that several exhibits attached to Plaintiff's response brief are not authenticated or are simply irrelevant to the questions of law presented here. As for Plaintiff's responses to Defendant's statements of undisputed fact, Defendant argues that Plaintiff has failed to cite evidence to support his contentions about the facts or to demonstrate that a genuine dispute about some of Defendant's statements exists. In other instances, Plaintiff has simply not responded to Defendant's statement of fact at all. Defendant requests that the Court deem admitted any statements of fact to which Plaintiff has not responded or which Plaintiff has not supported with admissible evidence. Defendant argues that based on the record before the Court, Defendant is entitled to summary judgment on all of Plaintiff's claims.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[26] In reviewing a motion for summary judgment, the

---

[26] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

evidence must be viewed in the light most favorable to the nonmoving party,[27] and the "judge may not make credibility determinations or weigh the evidence."[28] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[29] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[30] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[31] In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[32]

When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[33] Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[34]

---

[27] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[28] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[29] *Celotex*, 477 U.S. at 324.

[30] *Matsushita*, 475 U.S. at 586.

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[32] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[33] *Anderson*, 477 U.S. at 251-52.

[34] *Celotex*, 477 U.S. at 322.

<u>**ANALYSIS**</u>

**I. Evidentiary Objections**

At the outset Defendant has raised a number of evidentiary objections to Plaintiff's exhibits

at summary judgment. Local Rule of Court 56.1(e) permits a party to raise evidentiary objections

to materials offered in opposition to a motion for summary judgment.[35] The Sixth Circuit has held

it is improper for a district court to consider for purposes of summary judgment documents that are

not admissible in evidence.[36] The Court finds that Defendant's evidentiary objections are well-taken.

Plaintiff has not properly authenticated several exhibits to establish their reliability including memos,

emails, and an unsworn written statement from Plaintiff.[37] Specifically, Plaintiff has not

authenticated exhibits 1, 2, 3, 7, and 13.[38] Because Plaintiff has not authenticated these exhibits, the

Court declines to consider them at summary judgment.

Defendant also objects to correspondence, attached as exhibit 12 to Plaintiff's brief (D.E. #

54-12), which contains settlement discussions between the parties. Defendant argues that the exhibit

is inadmissible under Federal Rule of Evidence 408. The Court agrees. As a general rule, evidence

of settlement talks between the parties is not admissible where the evidence is used to prove the

---

[35] *See* Local. R. 56.1(e).

[36] *Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009) (citing *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993)).

[37] *Alexander*, 576 F.3d at 561 (holding that unauthenticated e-mails, hand-written notes, unidentified typed writings, and resumes were not admissible at summary judgment).

[38] Defendant has also objected that exhibits 7 and 13 contain hearsay. "A court cannot rely on unsworn inadmissible hearsay when ruling on a summary judgment motion." *Hoover v. Walsh*, 682 F.3d 481, 491 n.1 (6th Cir. 2012) (quotation omitted). Because the Court declines to consider these exhibits on other grounds, the Court need not address Defendant's hearsay objection.

validity of a disputed claim.[39]   Plaintiff offers the evidence to support his contention that "the overtime and money issue played a part in plaintiff [sic] termination because Drexel paid all overtime 1 week after termination and plaintiff refusal [sic] to sign wavier [sic]."[40]   In other words Plaintiff offers the evidence to support his allegation that Defendant violated the FLSA.   The Court holds that Rule 408 applies and that exhibit 12 is inadmissible.   Therefore, the Court will not consider the exhibit as part of its summary judgment analysis.

Defendant's remaining objections concern Plaintiff's responses to Defendant's statements of undisputed fact.   Federal Rule of Civil Procedure 56(c) requires that a party claiming that a fact is genuinely disputed must support its claim by citing to "particular parts of materials in the record."[41]   Rule 56(e) provides that where a party fails to properly support an assertion of fact, the Court may consider the fact undisputed for purposes of summary judgment.[42]   According to Defendant, Plaintiff has not cited evidence to support his factual assertions or has simply failed to respond to Defendant's statements of fact.   Defendant requests that the Court deem admitted any statements of fact to which Plaintiff has not responded or which Plaintiff has not supported with admissible evidence.   The Court has already addressed Defendant's objections in its recitation of the record facts and deemed certain facts undisputed.

While the Court "need consider only the cited materials" under Rule 56(c)(3), "it may

---

[39] *Arnold v. Wilder*, 657 F.3d 353, 366 (6th Cir. 2011).

[40] Pl.'s Resp. in Opp'n 9 (D.E. # 54).

[41] Fed. R. Civ. P. 56(c)(1)(A).

[42] Fed. R. Civ. P. 56(e)(2).

consider other materials in the record."[43]  In this case the Court has reviewed all of the admissible evidence in the record, not just the specific evidence cited in the parties' briefing.  The Court specifically finds cause to consider relevant material from Plaintiff's deposition testimony as part of its analysis, even though the parties have not cited the testimony.  Defendant attached portions of the deposition transcript to the Motion for Summary Judgment.   The Court discusses Plaintiff's testimony below.  Having determined which evidence is admissible and which record facts are not genuinely in dispute, the Court now considers the merits of Plaintiff's causes of action.

## I.  Race Discrimination

Defendant first seeks summary judgment on Plaintiff's claims for race discrimination under Title VII, 42 U.S.C. § 1981, and the THRA.  Title VII states that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of [his] race, color, religion, sex, or national origin."[44]  Section 1981 "prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[45]   The THRA makes it a "discriminatory practice for an employer to . . . discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin."[46]   Courts

---

[43] Fed. R. Civ. P. 56(c)(3).

[44] 42 U.S.C. § 2000e–2(a)(1).

[45] *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006) (other citations omitted).

[46] Tenn. Code Ann. § 4-21-401(a)(1).

21

evaluate section 1981 and THRA claims of discrimination under the same analytical framework and federal case law that apply to claims brought pursuant to Title VII.[47] Thus, the Court's "analysis and conclusions concerning the Title VII claims apply equally to parallel claims brought under THRA" and section 1981.[48]

Where as here a plaintiff offers only circumstantial evidence of unlawful discrimination, the Court analyzes the case using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[49] Plaintiff bears the initial burden to establish his prima facie case of discrimination by showing that (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees.[50]

The Court holds that Plaintiff cannot prove all of the elements of his prima facie case because Plaintiff has not shown that Defendant replaced him with a non-protected employee or treated him differently than similarly situated non-protected employees. Plaintiff admits that he has no evidence to show that he was replaced by a person outside of his protected class. "An employee is replaced

---

[47] *Jackson v. Bd. of Educ. of Memphis City Sch. of Memphis, Tenn.*, No. 10-5937, 2012 WL 3326305, at *4 n.1 (6th Cir. Aug. 14, 2012) (citation omitted); Tenn. Code Ann. § 4-21-311(e) (codifying *McDonnell Douglas* burden shifting framework in THRA cases).

[48] *Jackson*, 2012 WL 3326305, at *4 n.1.

[49] *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

[50] *Serrano v. Cintas Corp.*, 699 F.3d 884, 892-93 (6th Cir. 2012).

only where another employee is hired or reassigned to perform the plaintiff's duties."[51]  On the other hand, "spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."[52]  Plaintiff has no proof that another employee was hired or reassigned to perform his duties as QC lab manager after his termination.  As such, Plaintiff cannot establish that he was replaced by a non-protected employee.

Moreover, Plaintiff has no proof of similarly situated, non-protected employees receiving more favorable treatment.   Two employees must be "similarly-situated" in all relevant aspects of their respective employment circumstances.[53]  The comparison employee (1) must have dealt with the same supervisor, (2) have been subject to the same standards, and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."[54]  Plaintiff compares himself in this case to Jim Reagor, Defendant's director of purchasing and scheduling who had previous experience in QC.  The undisputed facts show that Plaintiff actually reported to Reagor and that Reagor was one of the decision-makers to terminate Plaintiff's employment.  There is simply no evidence suggesting that Plaintiff and Reagor were subject to the same standards of conduct.  Even if they were, Plaintiff has not cited any evidence of Reagor "engag[ing] in acts of comparable seriousness" to Plaintiff's

---

[51] *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 454 (6th Cir. 2011) (quoting *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)).

[52] *Webb*, 438 F. App'x at 454 (quoting *Lilley v. BTM Corp.,* 958 F.2d 746, 752 (6th Cir. 1992)).

[53]  *Ercegovich v. Goodyear Tire & Rubber*, 154 F.3d 344, 353 (6th Cir. 1998).

[54]  *Id.* at 352; *see also Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012).

conduct during the Diuron incident, that is, an act that led to a significant loss to the company. The Court finds then that Reagor is not a similarly situated comparator. Plaintiff also compares himself to the plant manager and assistant plant manager in Tunica. Just as with Reagor, Plaintiff has not shown that these employees were subject to the same standards that governed his job as the QC lab manager or that they engaged in any conduct that resulted in a monetary loss to the company.

At summary judgment Plaintiff merely disputes the amount of the loss to Defendant from the Diuron episode and his culpability in the incident. Plaintiff argues that Defendant only had to blend the diluted batches with other batches to salvage them and avoid a loss. Even so, Plaintiff must first prove by circumstantial evidence that other non-protected employees were treated more favorably for the same kind of conduct, that is, other non-protected employees engaged in similar conduct but were not fired. Plaintiff has not cited any such evidence. The undisputed facts show that Plaintiff added water to the batches without first assaying the batches himself. Plaintiff relied instead on information reported from other chemists about the batches, including an unrecorded verbal report about batch number 106 from Hatten Grilliette. Defendant has adduced proof that Plaintiff should have assayed the batches himself and that his conduct violated standard operating procedures and caused a loss to Defendant of $10,000 to $15,000. At summary judgment Plaintiff must produce evidence to create a genuine dispute about whether others engaged in substantially similar conduct but without being terminated. Plaintiff has only testified that it was not necessary for him to "recheck those numbers because Hatten was a so-called expert."[55] In other words, Plaintiff disputes that he deviated from any standard operating procedure. Without proof to create a genuine dispute about similarly situated comparators engaging in similar conduct and receiving more favorable

---

[55] Nichols Dep. 125:6-19, Mar. 23, 2012 (D.E. # 45-4).

treatment, Plaintiff cannot establish his claim for race discrimination. Therefore, Defendant's Motion is **GRANTED** on this issue.

## II. Age Discrimination

Defendant next seeks summary judgment on Plaintiff's claim of age discrimination. In order to carry his burden, Plaintiff must adduce evidence to prove the following elements of his ADEA claim: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.[56] The Court holds that Plaintiff has no proof of circumstances that support an inference of discrimination. Plaintiff has not adduced any evidence of a substantially younger employee replacing him as QC lab manager[57] or evidence of a non-protected employees receiving more favorable treatment.[58] Plaintiff admitted in his deposition that he had only his own opinions but no facts to support his age discrimination claim.[59] Without more, Plaintiff cannot establish his claim. Therefore, Defendant's Motion is **GRANTED** on Plaintiff's age discrimination claims.

---

[56] *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Just as with Plaintiff's race discrimination claim, the same standards applied under the ADEA apply to his age discrimination claim under Tennessee law. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) (citation omitted).

[57] *Blizzard*, 698 F.3d at 283 (holding that evidence of a protected employee being replaced by a significantly younger employee supports an inference of age discrimination).

[58] *Grosjean*, 349 F.3d at 340.

[59] Nichols Dep. 331:8-12. Plaintiff went on to testify that he knew of another employee who was 70 years of age, had worked for Defendant for over 30 years, and made only seven or eight dollars per hour. *Id.* 33:14-24. Plaintiff has not shown why this evidence is relevant to Plaintiff's claim for age discrimination.

## III. Fair Labor Standards Act

Defendant has also moved for judgment as a matter of law on Plaintiff's FLSA claim for overtime compensation. "The FLSA requires employers to pay at least a specified minimum wage for each hour worked, *see* 29 U.S.C. § 206, and overtime compensation for employment in excess of forty hours in a workweek, 29 U.S.C. § 207(a)(1)."[60] Non-exempt employees are entitled to "time-and-a-half for work performed in excess of forty hours per week."[61] A plaintiff asserting a claim for overtime under the FLSA must prove "by a preponderance of the evidence that he or she 'performed work for which he [or she] was not properly compensated.'"[62] Plaintiff has adduced evidence that Defendant compensated him for overtime he worked both as a chemist and as the QC lab manager, an amount totaling almost $5,400. The undisputed evidence shows that Plaintiff recorded his hours worked in a notebook which is no longer in his possession. Plaintiff also admitted that he told another lab employee he had received all of the overtime compensation to which he was entitled and that he has no other evidence to support his claim. In short, Plaintiff has not shown that he worked any overtime for which Defendant failed to compensate him. Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's FLSA claim.

## IV. Retaliation under Title VII

Defendant next seeks summary judgment on Plaintiff's claim for retaliation. Title 42, U.S.C.

---

[60] *Chao v. Tradesmen Int'l, Inc.*, 310 F.3d 904, 907 (6th Cir. 2002).

[61] *Oldham v. U.S. Postal Serv.*, 465 F. App'x 440, 444 (6th Cir. 2012) (quoting *Acs v. Detroit Edison Co.*, 444 F.3d 763, 764–65 (6th Cir. 2006)).

[62] *Myers v. Copper Cellar Corp.,* 192 F.3d 546, 551 (6th Cir. 1999) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds,* Portal–to–Portal Act of 1947, 29 U.S.C. §§ 251–62).

§ 2000e–3 provides

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.[63]

In order to make out his prima facie case of retaliation, Plaintiff must demonstrate the following: (1) that he engaged in protected conduct; (2) that Defendant had knowledge of his protected activity; (3) that Defendant took an adverse employment action against him; and (4) that there was a causal connection between the protected activity and the adverse employment action.[64] "Under Title VII, there are two types of protected activity: participation in a proceeding with the Equal Employment Opportunity Commission ('EEOC') and opposition to an apparent Title VII violation."[65] In the case at bar, Plaintiff has not shown that he engaged in any form of protected activity. There is no evidence in the record that Plaintiff ever participated in an EEOC proceeding or stated his opposition in any form to a policy or practice which violated Title VII. As such, Defendant is entitled to judgment as a matter of law on this issue. Therefore, Defendant's Motion is **GRANTED** as to Plaintiff's Title VII retaliation claim.

## V. State Law Claims

As a final matter, Defendant moves for summary judgment on Plaintiff's state law claims for negligent hiring and training and IIED. "A plaintiff in Tennessee may recover for negligent hiring,

---

[63] 42 U.S.C. § 2000e–3.

[64] *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

[65] *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) (citation omitted).

supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job."[66] A plaintiff must prove the following elements in order to state a claim of negligence: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause."[67] Here Plaintiff has not identified which employees Defendant negligently hired and trained, much less adduced any evidence to prove that Defendant had knowledge of any employee's unfitness for the job. The Court holds that Defendant is entitled to judgment as a matter of law for this reason alone.

Based on Plaintiff's responses to Defendant's statement of facts, Plaintiff is not claiming negligent hiring and supervision but simple negligence in Defendant's decision to terminate his employment over the Diuron incident. Plaintiff states that "Defendant was negligent in wrongfully terminating the plaintiff"[68] and that "Plaintiff has evident [sic] (batch sheets) to support his claim for negligence."[69] To the extent that Plaintiff is now alleging simple negligence, Plaintiff has not alleged this claim in his pleadings. A plaintiff may not "expand [his] claims to assert new theories" at summary judgment.[70] "At the summary judgment stage, the proper procedure for plaintiffs to assert

---

[66] *Doe v. Catholic Bishop for Diocese of Memphis,* 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008); *Holt v. Macy's Retail Holdings, Inc.,* 719 F. Supp. 2d 903, 917 (W.D. Tenn. 2010).

[67] *Giggers v. Memphis Hous. Auth.,* 277 S.W.3d 359, 364 (Tenn. 2009); *Freeman v. Wal–Mart Stores East, LP*, 781 F. Supp. 2d 661, 669 (E.D. Tenn. 2011) (citing *Giggers* in its analysis of a negligent hiring and retention claim).

[68] Pl.'s Resp. to Def.'s Statement of Undisputed Fact ¶ 51.

[69] *Id.* ¶ 52.

[70] *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007).

a new claim is to amend the complaint in accordance with Rule 15(a)."[71]  The Court holds then that

Defendant is entitled to judgment as a matter of law on Plaintiff's claim for negligent hiring and

training.

Summary judgment is proper as to Plaintiff's IIED claim as well.[72]  To prove a claim for

IIED, Plaintiff must show that: (1) the conduct complained of was intentional or reckless, (2) the

conduct is so outrageous that it is not tolerated by a civilized society, and (3) the conduct resulted

in serious mental injury.[73]  Such conduct does not include "mere insults, indignities, threats,

annoyances, petty oppression or other trivialities."[74] Thus, a plaintiff seeking damages for IIED must

meet "an exacting standard," one which requires a plaintiff to prove conduct "so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency and to be

regarded as atrocious, and utterly intolerable in a civilized community."[75]  Tennessee courts have

granted summary judgment on IIED claims as a matter of law.[76]  Even viewing the evidence here

---

[71] *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)).

[72] *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012).

[73] *Bain v. Wells* , 936 S.W.2d 618, 622 (Tenn. 1997).

[74] *Id.* (quoting *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966)); *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 539 (Tenn. Ct. App. 2003).

[75] *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

[76] *Arnett*, 124 S.W.3d at 540 (affirming grant of summary judgment where IIED claim was based on race discrimination); *Weaver v. Pardue*, M2010-00124-COA-R3-CV, 2010 WL 4272687, at *5 (Tenn. Ct. App. Oct. 28, 2010) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so.") (quoting Restatement

in the light most favorable to Plaintiff, Plaintiff has not established any mental injury or stress "so sever that no reasonable person would be expected to endure it."[77] Discrimination or termination of one's employment is typically insufficient to prove an IIED claim.[78] As such, summary judgment is warranted on this claim. Therefore, Defendant's Motion is **GRANTED** as to Plaintiff's state law claims.

## CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, the Court holds that Defendant is entitled to judgment as a matter of law on Plaintiff's claims for race and age discrimination, overtime pay under the FLSA, retaliation, negligent hiring and training, and IIED. Therefore, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: May 23, 2013.

---

(Second) of Torts § 46 cmt. h (1965)).

[77] *Arnett*, 124 S.W.3d at 540 ("Recovery for intentional infliction of emotional distress is limited to mental injury which is so severe that no reasonable person would be expected to endure it.").

[78] *Nettles v. Hotel Peabody, G.P.*, No. 2:09-CV-02776-JPM, 2010 WL 5093362, at *3 (W.D. Tenn. Dec. 8, 2010) (citations omitted).